**Michael PLUMMER, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 98–CF–1612.**

District of Columbia Court of Appeals.

Argued Nov. 30, 2000.
Decided Dec. 31, 2002.

Timothy P. O'Toole, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Marc E. Rindner, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, John R. Fisher, Mary Patrice Brown, and Glenn L. Kirschner,

Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, RUIZ and WASHINGTON, Associate Judges.

RUIZ, Associate Judge:

Michael Plummer appeals from his conviction of first-degree, premeditated murder while armed,[1] and related weapons offenses[2] arguing that a "pervasive, prejudicial atmosphere infected his trial." Specifically, he claims that the trial court erred in allowing the jury to speculate, without a firm evidentiary basis, that this and another shooting were gang-related and that appellant had confessed to the crime to a person who did not testify at trial. Appellant also claims that the judge improperly allowed irrelevant and inflammatory testimony and argument urging conviction on the basis of community sentiment and sympathy for the murder victim's relatives and friends. We hold that any error in this case was harmless, and affirm.

## FACTUAL SUMMARY

*The government's evidence*

On July 2, 1996, at approximately 11:00 p.m., in the unit block of O Street, N.W., Washington, D.C., sixteen-year-old Dennis Hines was shot twice, at close range, in the head and back. He subsequently died from those gunshot wounds.

After Dennis Hines's death, rumors began circulating that appellant, also a sixteen-year-old young man from a nearby neighborhood, had been the shooter. In January of 1997, six months after the shooting, the police arrested appellant. He was indicted on first-degree murder and related weapons offenses in August of that year after three eyewitnesses testified before the grand jury and identified appellant as the shooter. When appellant was first brought to trial, in February of 1998, the government presented the testimony of three eyewitnesses; the testimony of Calvin Gaither, the best friend of the murder victim and a government informant, who claimed that appellant had confessed to killing Dennis Hines; and the testimony of William "Jeff" Mitchell, a neighborhood resident whose daughter, Tia, had been killed shortly after Dennis Hines, and who had testified at the grand jury, but subsequently recanted at trial, that appellant had apologized for setting off the cycle of violence that resulted in the death of his friend Tia. The government also presented the medical examiner, who testified that two shots had been fired causing four wounds to Dennis Hines's head, ear, shoulder and ribs. Although police recovered a bullet, there was no physical evidence linking appellant to the shooting. After deliberating for three days, the jury deadlocked on all counts.

In June of 1998, appellant was tried before a second jury and a different judge. This trial featured the same three eyewitnesses, informant and medical testimony presented in the first trial, but did not include Jeff Mitchell. The evidence demonstrated that before he was shot, Dennis Hines had been sitting in front of 18–A O Street, N.W., between 1st Street and North Capitol Street, speaking with Natalie Burks, Nichole Burks, and Larry Morgan.[3] Natalie testified that she noticed a

1. *See* D.C.Code §§ 22–2401, –3202.

2. Possession of a firearm during the commission of a crime of violence or dangerous offense, *see* D.C.Code § 22–3204(b), and carry-

ing a pistol without a license, *see* D.C.Code § 22–3202(a).

3. Natalie testified that she had "a little" to drink the night of the shooting, about an inch

young man emerge from an alley near North Capitol Street, and recognized him as someone she had seen in the neighborhood. Natalie saw the young man approach Dennis Hines, pull a gun from his waistband, and point it at Dennis Hines's head. He pulled the trigger, but the gun did not fire. Then, he pulled it again and shot Dennis Hines four times. Natalie grabbed her daughter, Nichole, who had been sitting nearby, and ran with her toward North Capitol Street. As they ran, Natalie looked back and saw the gunman fire another shot at Dennis Hines as he was trying to get up off the ground. In court, Natalie identified appellant as the shooter and testified that she saw appellant fire five or six shots at Hines from a distance of a couple of inches.

Larry Morgan testified[4] that he had been drinking alcohol that night with Dennis Hines, but was not drunk, and had left the group and begun to walk up O Street, N.W., toward 1st Street. As he was about three or four houses away, he heard five or six gunshots from behind him, turned around, and saw appellant, whom he knew from the neighborhood, shooting at Dennis Hines.

Following the shooting, neither Natalie Burks, her daughter, Nichole, nor Larry Morgan informed the police of what they had witnessed. One year later, in July, 1997, they were subpoenaed to appear before the grand jury, at which time Detective Timothy Doughty met individually with each one. Natalie and Nichole Burks identified appellant from an array of photographs of young men. Larry Morgan told Detective Doughty that he knew the shooter as "Michael Plummer," and also identified appellant from an array of photographs.

### Testimony of Calvin Gaither

Calvin Gaither, a convicted felon and local drug dealer who had been a good friend of Dennis Hines, testified that the previous summer appellant had confessed to him in the D.C. Jail to shooting Dennis Hines, by apologizing for "what he had done" and by saying that he "had acted too fast." Gaither further testified that appellant asked if they could "squash the beef," apparently referring to a feud between the Sursum Corda neighborhood and the 1st and O Street neighborhood.[5] According to Gaither, by "squash[ing] the beef," appellant meant that "he didn't want no more violence going on." When the prosecutor then asked if there had been other violence between the two groups, defense counsel objected. At the bench, a colloquy took place in which the prosecutor said he wanted to refer to the retaliatory killing of appellant's friend, Tia Mitchell, which had followed shortly after the shooting of Dennis Hines. When defense counsel argued that the Tia Mitchell killing and "the beef" were not relevant to any issues at trial, the prosecutor agreed that he would withdraw the question concerning Tia Mitchell. As the prosecutor asked Gaither a follow-up question about how he responded to appellant's request that he "squash the beef," Gaither referred to the gang violence by stating that he told appellant, "we lost one;

and a half to two inches of Remy–Martin, but that the alcohol she had did not affect her ability to see.

4. Mr. Morgan was murdered prior to appellant's retrial, but testified at appellant's first trial. The government introduced his prior testimony through a transcript, which was read by a police officer. The jury was told of

Mr. Morgan's death, but was instructed not to speculate about how he had died.

5. At the first trial, the government attempted to have Gaither explain that the "beef" referred to a purported feud between the two gangs, but the trial judge refused to permit any testimony on the subject.

they lost one. Yeah, let's squash it." The prosecutor then approached the bench and asked the judge if he could ask the witness what he meant by "we lost one; you lost one." Over defense objection, the trial judge permitted the additional question reasoning that "since they don't know what it's in reference to, it could be misunderstood as a reference to a killing by Dennis Hines for which Mr. Plummer is retaliating and that would not be reasonable." The following questioning by the prosecutor and testimony by Gaither ensued:

Q Mr. Gaither, when you told Mr. Plummer "Yeah, we lost one; you lost one, let's just squash the beef," what did you mean by that?

A That they lost a close friend and we lost a close friend so we didn't need nobody else to get kill.

Q Who was the close friend that you all lost?

A Little Dennis.

Q And who was the close friend that they lost?

A A girl named Tia.

Q Now I should ask just to clarify, did Little Dennis have anything to do with killing Tia?

A No, he got killed first.

. . . . .

Q How would you—did you continue to talk to Mr. Plummer or was that just a one-time talk?

A No, we became all right, you know, friends you could say.

Q Okay. You became friendly even though you guys were sort of on the opposite side of things?

A Yeah.

*Cross–Examination of Appellant*

Appellant denied shooting Dennis Hines and stated that he was not in the area of 1st and O Streets, N.W., on the evening of July 2, 1996, although he could not remember where he was or what he was doing at that time. He said he had no relationship with Calvin Gaither, testified that he never discussed his case with him and, to the contrary, asked Gaither to stop trying to ask appellant about his pending case. He also testified that he never suggested to Gaither that they "squash the beef," nor did he know what that phrase meant.

On cross-examination, the government asked appellant if he was familiar with the "Sursum Corda area," and the "1st and O Street area"—the areas where the prosecutor had told the judge that the two gangs were located. Asked whether he had "friends" in the Sursum Corda area, appellant testified that he never had any problems with the folks from the area of 1st and O Streets, N.W. Appellant was asked whether he knew Tia Mitchell, and he said that he did. The prosecutor then asked whether appellant had talked to her father, Jeff Mitchell, "about the fact that Tia got killed because you had smoked Little Dennis [Hines] two nights earlier, didn't you?" Appellant denied making such comments. The government never called Mr. Mitchell to substantiate the remark.[6]

---

**6.** Defense counsel objected to the questioning, as Jeff Mitchell had not been called as a witness. In the first trial, the government had called Mr. Mitchell as a witness, and he testified that appellant had been a friend of his daughter, Tia, and that appellant had approached him and told him he was sorry about his daughter's death. Before the grand jury, Mr. Mitchell had previously testified that appellant had confessed to shooting Dennis Hines, but, at trial, he disavowed his grand jury testimony. Instead, he said his grand jury testimony was based on the fact that he had heard rumors of appellant's role in starting the violence that led to his daughter's death, and that he had wanted someone to

## ANALYSIS

*1. Testimony about the alleged gang-related motivation behind the murder.*

 Appellant contends that the trial court erred when it allowed testimony from which the jury could speculate that gang retaliation was the motive for the killing of Dennis Hines on July 2, 1996, and the killing of Tia Mitchell two days later. He argues that even the limited explanation of Gaither's understanding of the conversation he had with appellant about "squashing the beef" was irrelevant to the question the jury had to decide—whether it was appellant who killed Dennis Hines. Contending that Gaither's testimony was unfairly prejudicial because it supplied a motive to an otherwise unexplained murder, appellant argues he is entitled to a new trial.[7] The government responds that the evidence of the gang feud was relevant because Gaither's testimony about "squashing the beef" had left the character of the victim potentially at issue, as the jury could have thought that Hines had killed someone, and that appellant had shot him in retaliation. This potential misunderstanding, according to the government, needed to be cleared up for the jury.

 The trial court's decisions about admission or exclusion of evidence are reviewed for abuse of discretion. *See Mercer v. United States*, 724 A.2d 1176, 1182 (D.C.1999).[8] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Street v. United States*, 602 A.2d 141, 143 (D.C.1992). "[O]rdinarily, any evidence which is logically probative of some fact in issue is admissible [and][i]f the evidence offered conduces in any rea-

---

suffer just as much as he did. He told the jury in the first trial that "It's unfair for me to give that testimony that I gave you about this man, here ... I am just angry and pissed off and all of the above." At the second trial, although the prosecutor announced that Mr. Mitchell would testify that appellant's participation in a gang feud had precipitated his killing of Dennis Hines, the government never called Mr. Mitchell.

7. Appellant characterizes the trial court's ruling as based on the doctrine of curative admissibility and argues that reliance on that doctrine was in error. The government agrees that the doctrine of curative admissibility was inapplicable in the circumstances presented, but argues that this was not the basis for the trial court's ruling. Instead, the government argues, the evidence was independently relevant. The doctrine of curative admissibility provides that in certain circumstances the prosecution may inquire into otherwise inadmissible evidence, but only after the defense has "open[ed] the door" with regard to this evidence. *See Mercer v. United States*, 724 A.2d 1176, 1192 (D.C.1999). Moreover, the doctrine of curative admissibility is limited and permitted, "only to the ex-

tent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." *See id.* We agree that the doctrine is not applicable to this case, as the defense did not open the door to Gaither's testimony on the subject of "squashing the beef."

8. When the government sought to elicit from Mr. Gaither what he had meant by the phrase, "we lost one, you lost one," appellant objected on relevance grounds. After colloquy, the prosecutor then withdrew the question. Later, when the government wanted to follow-up on the disputed line of questioning, appellant's counsel voiced his concern stating, "why can't we just leave it at that ... what's in this man's mind it does [not] seem to me that it much matters ..." The court ruled that "the witness should be permitted to say what he was talking about. Just get it out and leave it at that." "Appellate courts have reviewed a trial court's decision on the admissibility of evidence under an abuse of discretion standard, even when it is not clear that the defendant made a contemporaneous objection, so long as the trial court ruled on the substance of the objection." *See Mercer*, 724 A.2d at 1182. That is the case here.

sonable degree to establish the probability or improbability of [a] fact in controversy, it should go to the jury." *Dockery v. United States*, 746 A.2d 303, 306 (D.C. 2000) (internal quotations and citations omitted). That evidence may be relevant, however, does not end the trial court's analysis. *See Mercer*, 724 A.2d at 1184. The weighing of probative value versus prejudice must always be part of the trial judge's consideration, and the trial judge has the discretion to exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice. *See id.* "Unfair prejudice within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (internal quotations and citations omitted).

Specifically, we have cautioned trial judges to consider carefully before admitting evidence of gang retaliation, and then only after ensuring that the government's evidence is relevant, necessary and supported by competent evidence. In *Mercer*, we held that evidence of threats against a witness had the potential for great prejudice against the defendant because "it implied that [the witness] had received some type of threat [from the defendant] regarding her testimony. This type of evidence could very well have aroused the passions of the jury...." *Id.* at 1186.

In this case, appellant argues that Gaither's testimony on what he meant by "squashing the beef" was irrelevant to the issue of appellant's guilt for the shooting of Dennis Hines, and there also was no need to inform the jury that Dennis Hines had not committed a murder for which appellant was retaliating because the only other killing that had been alluded to—that of

Tia Mitchell—occurred two days after Dennis Hines was killed, and could not have been committed by him. Further, he argues, Gaither's testimony was unfairly prejudicial to the extent it suggested—without substantiation [9]—that the murder before the jury was in retaliation for a gang-related dispute, particularly after Gaither added that he told appellant "we lost one; you lost one." All this, according to appellant, could have been interpreted by the jury as a reference to gang violence. He argues that the prosecutor drove the point home when he commented during closing that Gaither had become "friendly [with appellant] even though you guys were part of the opposite side of things."

■ We need not decide whether allowing the testimony referring to gang violence was error,[10] because we conclude that it was harmless in light of the evidence arrayed against appellant. *See Johnson v. United States*, 398 A.2d 354, 366 (D.C.1979) (noting that part of abuse of discretion is whether error was "of a magnitude requiring reversal"). References to a gang feud can supply to the jury a motive for an otherwise unexplained killing or suggest witness intimidation. Unlike in *Mercer*, however, Gaither did not testify that appellant had threatened him for testifying. Even though the reference to opposing neighborhood groups could have suggested a motive for appellant's killing of Dennis Hines, appellant concedes in his brief that Gaither's testimony about appellant's purported "confession" was extremely vague, and could be interpreted by the jury either as appellant saying he was sorry that Dennis Hines, who was Gaith-

---

9. Gaither, who was locked up at the time of both killings, had no personal knowledge and was therefore incompetent to testify about the motivation behind them.

10. The government argues that the plain error standard of review applies. In view of our disposition, we need not decide the issue.

er's friend, was killed, or that he was sorry he had killed Dennis Hines. In addition, Gaither's testimony implied that appellant wanted the violence to end after the two killings. We also take into account that Gaither was extensively impeached with the fact that he was incarcerated when both of the killings he testified about were committed, as well as with his failure to tell the government at the time of appellant's "apology" for the killing of Dennis Hines, even though Gaither then had an agreement to cooperate with prosecutors, and did not do so until his own sentencing was imminent. More importantly, the evidence at trial of appellant's guilt was considerable, including three eyewitnesses who knew appellant from the neighborhood. The jury was made aware that while these witnesses had not come forward immediately after the shooting, they had no apparent motive to lie. Viewing the testimony about gang violence in the context of the entire record, we conclude the error was harmless. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

*2. Cross-examination of appellant on his statements to William Jeffrey Mitchell*

 Appellant claims that the trial court erroneously permitted the government to cross-examine him, without evidentiary foundation, on his statement to Tia Mitchell's father that he was "sorry" she was killed. Appellant testified that he never confessed to Mr. Mitchell and, at the first trial, Mr. Mitchell recanted under oath his testimony to the grand jury about the appellant's purported confession that it was his killing of Dennis Hines that led to the retaliatory killing of Tia Mitchell.

Moreover, not even the fact that Tia Mitchell was killed—much less who killed her and why—was proven at trial.

 We review this questioning for plain error because appellant did not object at trial. *See Watts v. United States*, 362 A.2d 706, 709 (D.C.1976). Thus, we will reverse only if the error is obvious and "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Id.*

 It is impermissible for the government to "manufacture evidence by creating an impression in the minds of the jurors through questions that imply the existence of facts," unless the factual predicate for the question is "grounded in a good faith belief that those facts are susceptible to proof by competent evidence." *Ali v. United States*, 520 A.2d 306, 313 (D.C.1987). We agree with the government that the prior sworn testimony of Mr. Mitchell before the grand jury sufficed to give it a good faith basis to ask the question. Had the government called Mr. Mitchell, and had he denied that appellant confessed to him, he could have been impeached with his prior sworn testimony. *See (Darryl) Jones v. United States*, 719 A.2d 92, 93 (D.C.1998). Moreover, the questioning was limited and the government did not mention appellant's purported "confession" to Mr. Mitchell in closing argument. Therefore, we hold there was no plain error.

*3. Appeal to the emotions and community sentiment and sympathy for decedent's relatives*[11] *and friends*

 Nichole Burks became emotional on the stand and refused to answer

---

11. The government presented Dennis Hines's mother who testified, over objection, that after the shooting she ran outside late at night in her night clothes and saw her son lying in the street. Ms. Hines tried to speak to her son, but she said that he could only mumble in response. She identified a picture of her son, which was shown to the jury. The testi-

questions on cross-examination because she was crying uncontrollably. The government stated for the record that "she was scared to death. And I think she testified hesitatingly at the first trial as well, although just for the record she is actually crying." During closing argument, over objection, the government stressed that Nichole Burks had cried during her testimony, and was afraid, stating, "It wasn't a fun thing for her to do. She wasn't enjoying herself. You probably weren't enjoying watching her, that young lady, go through that. Did she appear to be terrified? Did she appear upset?" The prosecutor reinforced the gang violence theme by saying,

> And one of the more important things that Calvin Gaither said was as we kind of developed this—you know, he agreed to squash the beef, right? He said look, you lost one—I'm sorry—Calvin Gaither said you lost one; we lost one. Let's squash the beef, all right?

During rebuttal, the prosecutor exhorted the jury "as the conscience of the community," to find appellant guilty:

> Mr. Horton [defense counsel] says well, the defendant says he didn't do it. Folks, when the defendant took the stand, did you expect he was going to get up there and say, yeah, I killed Little Dennis. Of course not. He's motivated by self-preservation. He doesn't want to be held accountable. You all as the conscience of the community are the one who has to place responsibility -
> Defense counsel: May we approach please?
> Court: Overruled.
> Prosecutor: That's your job as members of the community.

Appellant contends that the trial court erroneously permitted the government to appeal to the jurors' emotions by presenting and stressing Nichole Burks's emotional trial testimony and the fear of gang violence in closing argument. The government argues that the testimony was relevant and the argument a reiteration of facts and circumstances which were already before the jury.

We have said, and repeat, that prosecutorial comments designed to inflame the jury's emotions and urging them to send messages on behalf of their communities are irrelevant and improper. *See Hawthorne v. United States*, 476 A.2d 164, 170 (D.C.1984); *Powell v. United States*, 455 A.2d 405, 410 (D.C.1982). When there is improper argument by the prosecutor, the conviction will be reversed if the error rises to the level of substantial prejudice, *i.e.*, unless "we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Powell*, 455 A.2d at 411 (internal quotations omitted). Decisive factors are the gravity of the misconduct, its direct relationship to the issue of innocence or guilt, the effect of corrective instructions, if any, and the weight of the evidence of appellant's guilt. *See Hawthorne*, 476 A.2d at 170.

In *Hawthorne*, we held that the prosecutor's arguments substantially prejudiced the appellants because the prosecutor had delivered most of his closing argument in the first person voice of the murder victim and presented himself as if he were the victim. *See id.* at 173. The court found these tactics to be an "ill-founded rhetori-

---

mony of Ms. Hines about events she witnessed on the night of the shooting was relevant to the murder charge before the jury. *See Chatmon v. United States*, 801 A.2d 92,

100 (D.C.2002) (noting that the "gritty reality of the crime, including its human toll, is relevant to the jury's consideration").

cal device" and used thoughts of the victim which obviously could not be in evidence. *See id.* at 171. In *Powell,* the prosecutor argued, among other things, "Isn't it time that this jury, acting as the conscience of this community, stood up and sent a message loud and clear to [the defendants that] we don't tolerate . . . the robbing of its citizens." 455 A.2d at 410. We held that the request that the jurors "send a message" to appellants was irrelevant and inappropriate, because "jurors are not empaneled to send messages on behalf of their community." *Id.*

We agree that the prosecutor should not have highlighted the emotional impact of the testimony during closing argument—particularly with respect to Nichole Burks being "scared to death"—but the jurors had already heard the evidence and seen the witness themselves. Of greater concern are the prosecutor's reiteration of Gaither's testimony implying gang violence and the prosecutor's improper appeals to "community conscience" during rebuttal argument. On balance, however, we do not think these comments—improper though they were—substantially prejudiced appellant's case. The prosecutor reiterated the statements Gaither had made about "squashing the beef" and "we lost one; you lost one," but did not expressly refer to gang violence as appellant's motive for killing Dennis Hines. The prosecutor's rebuttal included two phrases about the jury's role in the community, but did not request that the jury "send a message." We view the comments at issue in their context. Considering the significant evidence that appellant was the shooter, we do not believe that these comments substantially prejudiced appellant. *See Powell,* 455 A.2d at 411.

*Affirmed.*

SCHWELB, Associate Judge, concurring in the judgment:

In my opinion, the inconclusive discussion in the majority opinion of Plummer's unresolved contentions is unnecessary, since all members of the division agree that any hypothetical error was harmless. Accordingly, I concur in the judgment only.