IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 25, 2019 Session

## STATE OF TENNESSEE V. CORTEZ LEBRON SIMS

**Appeal from the Criminal Court for Hamilton County**
**No. 295685   Barry A. Steelman, Judge**

_____

### No. E2018-01268-CCA-R3-CD

_____

The Defendant, Cortez Lebron Sims, was convicted by a Hamilton County jury of one count of first degree premeditated murder, three counts of attempted first degree murder, and one count of employing a firearm during the commission of a dangerous felony.  The trial court imposed a sentence of life for the first degree murder conviction as well as concurrent sentences of twenty-five years for each attempted first degree murder conviction and a consecutive sentence of six years for the employing a firearm conviction.  On appeal, the Defendant argues that the trial court erred by: (1) denying the Defendant's motion for a change of venue; (2) admitting evidence related to a photographic lineup and an unavailable witness's prior identification of the Defendant; (3) admitting a gang validation form showing the Defendant's gang membership; (4) admitting a jail phone call between the Defendant and a third party; (5) admitting evidence of a gun and shell casings that were later determined to be unrelated to this case; (6) admitting a bloody onesie worn by the infant victim in this case; and (7) admitting evidence related to gang violence and an on-going gang feud.  Upon our review of the record, we determine that the trial court did not commit reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Brennan M. Wingerter, Knoxville, Tennessee, and Joshua P. Weiss, Chattanooga, Tennessee (on appeal); F. Lee Ortwein and Clancy J. Covert, Chattanooga, Tennessee (at trial), for the appellant, Cortez Lebron Sims.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Neal Pinkston, District Attorney General; and Lance W. Pope and Kevin Brown, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In the early morning hours of January 7, 2015, police officers responded to a 911 call about a shooting at an apartment in College Hill Courts in Chattanooga. Talitha Bowman was found deceased. Marcell Christopher, Bianca Horton, and Ms. Horton's fifteen-month-old daughter, Z.H., were injured. Two days later, the Defendant, who was 17 years old at the time, was arrested in Knoxville. After a transfer hearing on March 5, 2015, the Defendant was transferred from Juvenile Court to be tried as an adult in Criminal Court. On July 15, 2015, the Defendant was indicted for one count of premeditated first degree murder, three counts of attempted first degree murder, and three counts of employing a firearm during the commission of a dangerous felony. The State later dismissed two counts of employing a firearm during the commission of a dangerous felony, and the Defendant was convicted as charged of the remaining counts of the indictment by a Hamilton County jury.

Because the Defendant does not challenge the sufficiency of the convicting evidence, we will only briefly outline the evidence supporting his convictions to give context to the evidentiary and procedural issues raised on appeal. Ms. Horton passed away prior to trial, and Mr. Christopher adamantly refused to testify at the trial. The trial court declared them both to be unavailable witnesses and allowed the State to admit into evidence their testimony from the transfer hearing. *See* Tenn. R. Evid. 804. That testimony established that on the night of January 6, 2015, Ms. Horton was at her College Hill Courts apartment with her children, her friend Ms. Bowman, and her boyfriend Mr. Christopher, who also went by the nickname "Baby Watts." Ms. Horton and Mr. Christopher were sharing a bedroom while Ms. Bowman was sharing a bedroom with Ms. Horton's fifteen-month-old daughter, Z.H.

At some point during the night, Ms. Bowman went downstairs to answer a knock at the front door. Ms. Bowman called up the stairs, "Baby Watts, somebody want[s] you." Ms. Bowman came up the stairs followed by the person she had allowed into the house, who both Ms. Horton and Mr. Christopher identified as the Defendant. Although the Defendant was wearing a hoodie, both Ms. Horton and Mr. Christopher testified that they could see his face. Mr. Christopher recognized the Defendant because they had previously been housed together in a juvenile detention facility in Knoxville, and Ms. Horton recognized the Defendant because she had previously seen him with a group of people at the mall.

- 2 -

The Defendant stood at the landing at the top of the stairs, reached his arm into the room where Ms. Bowman and Z.H. were, and fired multiple shots. Mr. Christopher threw Ms. Horton to the floor. The Defendant then turned and fired several more shots into the bedroom where Ms. Horton and Mr. Christopher were located. One of the shots struck Ms. Horton's left arm. Mr. Christopher was struck on the left side of his chest by his heart as well as on his stomach and his side. Ms. Horton eventually made her way into the other room. She discovered that Ms. Bowman was dead and that Z.H. had been shot in the back, paralyzing her. The medical examiner later determined that Ms. Bowman had been shot twice and that she bled to death from damage to her heart, lungs, and liver.

Ms. Horton called 911 shortly after 1:00 a.m. One of the first officers on the scene was Officer James Avery, a criminal investigator for the Chattanooga Housing Authority. Officer Avery was wearing a body camera on his shoulder. The video recording depicted Z.H. being carried down the stairs by another officer. Ms. Horton was kneeling over the body of Ms. Bowman, and Officer Avery asked her to go downstairs as well. Mr. Christopher was still lying on the floor of the other bedroom being attended to by first responders. Officer Avery asked who shot them, and Mr. Christopher repeatedly said "Cortez Sims." When Officer Avery spoke to Ms. Horton, she said that she did not know the name of the person who shot them but that she could identify him if she saw his picture.

The surviving victims were taken to Erlanger Hospital for treatment. While Z.H. was in surgery, Officer William Salyers collected her blood-stained onesie from her hospital room. Investigator Christopher Blackwell, the lead investigator on the case, spoke to Ms. Horton at the hospital, and Ms. Horton provided a description of the suspect. Investigator Blackwell had another officer prepare a photographic lineup to present to Ms. Horton. Investigator Blackwell later took out juvenile attachments against the Defendant, and fugitive investigators were eventually able to locate and arrest the Defendant in Knoxville. About a week after the shooting, Investigator Blackwell was able to speak to Mr. Christopher in the hospital. Mr. Christopher identified the shooter as "Awax," which was known to be the Defendant's nickname.

Officer Caleb Brooks, a crime scene investigator, processed the apartment and collected evidence. Officer Brooks testified that there was no sign of forced entry to the front door. Officer Brooks collected a total of nine shell casings and five projectiles from the upstairs landing and rooms. Ballistics testing by the Tennessee Bureau of Investigation (TBI) later determined that all of the shell casings were fired from the same nine-millimeter handgun and all of the projectiles were fired from the same nine-millimeter handgun. Officer Brooks also responded to the home of Charles Toney, the Defendant's ex-stepbrother, on Talladega Avenue to collect a nine-millimeter handgun and shell casings found there. However, subsequent ballistics testing by the TBI

determined that the gun recovered from Talladega Avenue did not match the shell casings or projectiles found in the College Hill Courts apartment.

Investigator Jeremy Winbush, a former gang investigator for the Chattanooga Police Department who at the time of trial worked on a task force with the Federal Bureau of Investigation, testified as an expert in gang member validation and gang investigations. Investigator Winbush testified that the Defendant was a validated member of the Athens Park Bloods. Investigator Winbush explained that the Defendant's nickname "Awax" was composed of the letter "A" for Athens Park and the term "wax," which was slang for killing or hurting someone to handle a problem.

According to Investigator Winbush, at the time of the shooting in this case, there was an on-going feud between the Athens Park Bloods and the Bounty Hunter Bloods, of which Mr. Christopher was known to be a member. The feud began with a fight at a nightclub in December of 2013 between members of these two gangs. Investigator Winbush then discussed several shooting incidents believed to be related to this feud that occurred throughout 2014 and into the beginning of 2015, which are discussed in further detail in the analysis section of this opinion. Of particular relevance to the Defendant, on February 24, 2014, the Defendant's mother was shot outside of her home, and the shell casings were later matched to a gun recovered in the possession of Cornelius "Poo" Birdsong, the leader of the Bounty Hunter Bloods in Chattanooga. On October 27, 2014, the Defendant posted a picture on his Facebook page of another Athens Park Blood member who had been killed that same day by a member of the Bounty Hunter Bloods. Additionally, on January 1, 2015, just six days before the shooting in this case, Deaunte "Ta Ta Blood" Dean, a member of the Athens Park Bloods with whom the Defendant was friends on Facebook, was shot and killed through the front door of his home. Investigator Winbush testified that Mr. Christopher's name came up, among several others, as a possible suspect in the Dean murder.

The State introduced through Investigator Winbush a recording of a March 2016 jail phone call between the Defendant, who was in custody, and Mr. Birdsong. The Defendant identified himself at the beginning of the call by the nickname "Awax." Throughout the call, Mr. Birdsong used the term "Blood" and other terms associated with the gang. Most of the call was Mr. Birdsong explaining that he did not condone the feud and wanted to call a truce with Athens Park because both gangs are "different tribes of the same people," meaning different subsets of the Bloods gang. Mr. Birdsong also said that he did not approve of Mr. Christopher being a "snitch" because "when a [racial slur] do[es] something to you and you survive[,] you keep that [expletive] in the street[.]" The Defendant denied being involved in this shooting and told Mr. Birdsong that Mr. Christopher was lying. Mr. Birdsong said that he would try to get to Mr. Christopher to encourage him to recant his identification of the Defendant. The Defendant said he did not want anyone to threaten Mr. Christopher.

During cross-examination of Investigator Winbush, the defense entered into evidence the gang validation form and photographs of Vontelle "Yung West" Haddox, an associate of the Tree Top Pirus who also lived in College Hill Courts. Investigator Winbush agreed that in the audio-recording of Ms. Horton's transfer hearing testimony, it sounded like she testified that Ms. Bowman said, "Baby Watts, Yung West wants you," even though the transcript said that the name was inaudible. In rebuttal, the State called Mr. Haddox and his girlfriend Bria Jones to testify that they spent the night of January 6, 2015, together at a motel and that they did not leave to go to College Hill Courts. Mr. Haddox denied knowing Mr. Christopher, having a feud with him, or being involved in the shooting in this case.

**Analysis**

### I. Change of Venue

The Defendant argues that the trial court erred in denying his motion for a change of venue because, "due to the extensive and pervasive pretrial publicity" surrounding this case, particularly after the death of Ms. Horton, it was "highly unlikely [the Defendant] could receive a fair trial in Hamilton County[.]" The State responds that the Defendant has failed to provide an adequate record to establish that the trial court abused its discretion in denying the motion.

Generally, a criminal defendant must be tried in the county where the offense was committed. Tenn. R. Crim. P. 18(a). However, a trial court may order a change of venue "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). The decision whether to grant a defendant's motion for change of venue rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *State v. Sexton*, 368 S.W.3d 371, 387 (Tenn. 2012); *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993). "The mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue," nor will prejudice "be presumed on the mere showing of extensive pretrial publicity." *State v. Rogers*, 188 S.W.3d 593, 621 (Tenn. 2006) (internal citations omitted). "[I]n order to obtain relief on a claim that the trial court improperly denied a motion for a change of venue, a 'defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him.'" *Sexton*, 368 S.W.3d at 387 (quoting *Rogers*, 188 S.W.3d at 621).

On June 9, 2016, the Defendant filed a "Motion for Change of Venue and/or Sequestration of the Jury," asserting that there had been extensive local and national media coverage of this incident, the on-going gang violence in Chattanooga, and the murder of Ms. Horton, which was speculated to be retaliation for her testifying against

the Defendant. On November 11, 2016, the Defendant filed a supplemental motion for change of venue. Although there is a minute entry indicating that the trial court heard the motion on January 4, 2017, and took the matter under advisement, there is no transcript of the January hearing in the record on appeal. The Defendant filed a second supplemental motion on March 21, 2017. After a hearing on March 30, 2017, the trial court again took the matter under advisement, stating that it would address pretrial publicity through jury questionnaires and voir dire. Neither the completed jury questionnaires nor the transcript of voir dire is in the record on appeal. Instead, the trial transcript indicates that after twelve jurors and two alternates were selected and "duly accepted by both sides," the trial court denied the motion for change of venue, stating that "[t]he [c]ourt is satisfied that the parties have been able to select a jury that is sufficiently free from undue influence." Because the Defendant has not included the transcript of voir dire in the appellate record, we must presume that the empaneled jurors were fair and impartial and that the trial court did not abuse its discretion in denying the Defendant's motion for a change of venue. *See State v. Crenshaw*, 64 S.W.3d 374, 387 (Tenn. Crim. App. 2001) (citing *State v. Burton*, 751 S.W.2d 440, 451-52 (Tenn. Crim. App. 1988)). The Defendant is not entitled to relief on this issue.

## II. Photographic Lineup

The Defendant raises two issues related to the photographic lineup presented to Ms. Horton and her subsequent identification of the Defendant. First, he argues that Ms. Horton's in-court identification of the Defendant during the transfer hearing was tainted by an unduly suggestive photographic lineup and was unreliable. Second, he argues that Investigator Blackwell's trial testimony regarding the creation and presentation of the lineup should have been excluded as irrelevant or unduly prejudicial. We shall address each issue in turn.

### A. In-Court Identification by Bianca Horton

A conviction based upon an in-court identification of the defendant by an eyewitness, after that eyewitness made an out-of-court identification, will only be set aside if the out-of-court "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). To determine whether the identification procedure violated a defendant's right to due process, we apply the two-part test announced in *Neil v. Biggers*, 409 U.S. 188 (1972). First, we must determine whether the identification procedure was unduly or unnecessarily suggestive. *Id*. at 198. If the identification procedure is determined to be unduly suggestive, we must then determine whether, under the totality of the circumstances, the witness's identification was reliable despite the undue suggestion. *Biggers*, 409 U.S. at 199. However, if an identification procedure is not unduly suggestive, we need not apply the totality of the circumstances

test to determine reliability.  *See State v. Biggs*, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006); *State v. Butler*, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

On appeal, the Defendant argues that the photographic lineup was unduly suggestive because Investigator Blackwell was familiar with the Defendant before he showed the lineup to Ms. Horton and that her identification was not otherwise reliable because it had been tainted by hearing the Defendant's name repeated at the crime scene. Although there is a minute entry in the record indicating that the trial court heard and overruled the Defendant's motion to suppress Ms. Horton's identification in January 2017, there is no transcript of that hearing in the record on appeal.  As the appellant in this case, the Defendant bears the burden to prepare an adequate record for appellate review.  *See State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993).  Thus, there is nothing in the record concerning this issue except the actual photographs shown to Ms. Horton, which were subsequently introduced as an exhibit at trial.  From our review of the photographs presented to Ms. Horton, we disagree with the Defendant's contention that his photograph was "grossly dissimilar" with regard to the skin tone of the other subjects so as to render the photographic lineup unduly suggestive.  *See State v. Edwards*, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (holding that subjects must be "grossly dissimilar" before a lineup is deemed impermissibly suggestive based on the photographs alone); *see also State v. Donald Prescott*, No. W2012-02454-CCA-R3-CD, 2014 WL 1464179, at *8 (Tenn. Crim. App. Apr. 11, 2014) (citing *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)) ("Since viewing the photospread in order to reach a conclusion of whether or not it is unduly suggestive does not involve a credibility determination, this court is just as capable as the trial court to review the evidence and draw its own conclusions."), *no perm. app. filed*.  The Defendant is not entitled to relief on this issue.

*B. Testimony Related to Creation and Presentation of Photographic Lineup*

The parties had agreed prior to trial that Ms. Horton's out-of-court identification of the Defendant from the photographic lineup was inadmissible hearsay.  However, prior to Investigator Blackwell's trial testimony, the State informed the trial court that it intended to ask whether he presented a photographic lineup to Ms. Horton, ask about the procedures he followed, and introduce a copy of the photographs presented in the lineup as an exhibit.  The Defendant objected on the basis that the jury would be able to infer that Ms. Horton identified the Defendant.  The trial court asked the State if the proposed evidence was probative, to which the State responded that "[t]he steps that [Investigator Blackwell] takes as the lead investigator in the investigation . . . to make sure that he's right . . . in identifying the suspect that he charges are hugely relevant to his investigation," especially in light of the fact that Ms. Horton had died and would not be able to testify.  The Defendant argued that Ms. Horton's out-of-court identification was inadmissible hearsay, "and letting these pictures in is boot-strapping that hearsay and her identification which was made during that statement."

The trial court ruled as follows:

> I find that it's probative because it goes to what the investigator did to try to investigate the case and identify a suspect. I find that it's prejudicial because the jury might assume that at that time she identified Cortez Sims, which she did, but the jury can't know now because that in and of itself would be hearsay, but I find it's less prejudicial because Cortez Sims was identified by her at a later time, and therefore, that limits the prejudice that the jury might - - that might result if the jury did, in fact, suspect that she must have identified him at that particular time.

> I could give an instruction to the jury that they're not to draw any - - they're not to speculate about how she responded to the photo lineup, but that might draw more attention to the negative for this defense.

> Again, I mean, I find that it's probative because it shows what the detective did. Police get in trouble all the time for not doing what they're supposed to do, and I understand why the State's trying to do that, that they're not thorough enough. I find that it's potentially prejudicial because of what the jury might speculate about, but she identified him at a later point anyway.

The trial court stated that it would "allow the jury to at least know that [Investigator Blackwell] showed a photo lineup" and asked if the Defendant objected to the photographs, themselves, being admitted. The State argued that if the Defendant was going to argue misidentification, then the photographs shown to Ms. Horton were relevant. The Defendant's counsel agreed that, based on the trial court's ruling that Investigator Blackwell would be allowed to testify that he showed Ms. Horton a lineup, the Defendant's counsel wanted the photographs to also be admitted as evidence.

During his trial testimony, Investigator Blackwell testified that he went to Erlanger Hospital to get a statement from Ms. Horton and to determine if she would be willing to look at a photographic lineup. Investigator Blackwell described the procedure of having another officer prepare the lineup so that Investigator Blackwell would not be aware of which photograph was the Defendant's as well as the process by which photographs are selected as "fillers." The lineup introduced into evidence consisted of six full-page photographs and an instruction sheet. Investigator Blackwell testified that he went over the instruction page with Ms. Horton and that Ms. Horton looked through each picture individually. Investigator Blackwell testified that prior to showing Ms. Horton the lineup, he was aware that there was body camera footage in which the Defendant had

been identified as the shooter. Investigator Blackwell testified that the "next step" in his investigation was to take out juvenile attachments against the Defendant.

On appeal, the Defendant argues that the trial court erred in admitting this evidence related to the photographic lineup because it was both irrelevant and unduly prejudicial. The Defendant contends that "[i]f [Ms.] Horton's identification is inadmissible hearsay, then the fact that a photo lineup was conducted, whether pursuant to proper procedure or not, could not have had any relevancy at trial." The Defendant reiterates the argument he made at trial that the jury would be able to infer that Ms. Horton identified the Defendant. The Defendant asserts that the steps Investigator Blackwell took to identify a suspect "is simply a justification for admission of the out-of-court hearsay identification." The Defendant argues that because the jury can make the inference regarding Ms. Horton's identification, the evidence related to the photographic lineup was more prejudicial than probative. The State responds that the evidence related to the photographic lineup was relevant because it "illustrated the investigative process of the lead detective on the case," which would "certainly have some tendency to make the conclusions of the investigation more or less likely[.]" The State asserts that any prejudice created by the jury's ability to infer that Ms. Horton identified the Defendant was reduced by the fact that Ms. Horton identified the Defendant in her transfer hearing testimony that was subsequently admitted into evidence and played for the jury.

In considering the admissibility of evidence, the trial court must first determine whether the proffered evidence is relevant. *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "In other words, 'evidence is relevant if it helps the trier of fact resolve an issue of fact.'" *James*, 81 S.W. 3d at 757 (quoting Neil P. Cohen, et al., *Tennessee Law of Evidence* § 4.01[4], at 4-8 (4th ed. 2000)). Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Tenn. R. Evid. 403. "Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence." *James*, 81 S.W.3d at 757. "In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial." *State v. Kennedy*, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999) (citing *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995)).

"A trial court's decision to admit evidence based on its relevance will not be reversed absent an abuse of discretion in admitting the evidence." *State v. Stevens*, 78 S.W.3d 817, 847 (Tenn. 2002). An abuse of discretion occurs "when the court applied an

incorrect legal standard, reached an illogical conclusion, or based its decision on a clearly erroneous assessment of the evidence or employs reasoning that causes an injustice to the party complaining." *State v. Davidson*, 509 S.W.3d 156, 207 (Tenn. 2016). As recently explained by the Tennessee Supreme Court, "the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court," and where "'reasonable minds can disagree with the propriety of the decision,' the decision should be affirmed." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (quoting *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018)).

In this case, the primary factual issue to be resolved by the jury was the identity of the shooter. Thus, the steps taken by law enforcement in investigating this case would be "of consequence to the determination of the action" if they made the Defendant's identity as the shooter "more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; *see State v. Richard Lowell Blanchard*, No. M2010-01186-CCA-R3-CD, 2011 WL 2533753, at *5 (Tenn. Crim. App. June 24, 2011) (stating that even if a detective's testimony "was relevant to show how the investigation progressed to the defendant's becoming a suspect[, t]he question remains . . . whether the explanation of the investigation was itself relevant to a material issue," but concluding that any error was harmless), *perm. app. denied* (Tenn. June 12, 2013). Even without Ms. Horton's statement either identifying or failing to identify the Defendant, Investigator Blackwell's testimony demonstrated the thoroughness of the investigation into the identity of the shooter even after the identification by Mr. Christopher at the scene, which was made all the more relevant by the defense's theory of misidentification. The trial court did not abuse its discretion in determining that the evidence related to the photographic lineup was relevant under Rule 401.

The next question is whether the evidence related to the photographic lineup was substantially more prejudicial than probative under Rule 403. The Defendant has not argued that Investigator Blackwell's testimony or the photographic lineup would confuse or mislead the jury or otherwise cause the jury to decide the case on an improper basis. Instead, the concern was that the jury would be able to infer from this evidence that Ms. Horton made an out-of-court statement identifying the Defendant, which would be a form of indirect hearsay. *See State v. Christopher Christian Padgett*, No. E2018-00447-CCA-R3-CD, 2019 WL 2233890, at *6 (Tenn. Crim. App. May 23, 2019), *no perm. app. filed*. As explained in one treatise, indirect hearsay is an attempt "to get in hearsay through the back door" because "even though no words from the [declarant] were actually repeated," the jury "will have learned what the [declarant] said." *Id.* (quoting Neil P. Cohen et al., *Tennessee Law of Evidence*, § 8.01[11][b] (6th ed. 2011)). However, as found by the trial court, any risk that the jury would make such an inference was mitigated by the fact that Ms. Horton's transfer hearing testimony identifying the Defendant was subsequently admitted. *See* Tenn. R. Evid. 804(b)(1). Therefore, even if the trial court erred in admitting the evidence related to the photographic lineup as a form of indirect hearsay,

- 10 -

the Defendant has not established that he was unfairly prejudiced. *See State v. Heflin*, 15 S.W.3d 519, 523 (Tenn. Crim. App. 1999) (holding that error in admitting hearsay was harmless when "the same evidence was properly admitted" through other testimony). The Defendant is not entitled to relief on this issue.

### III. Gang Validation Form

The Defendant argues that the trial court erred in admitting the Chattanooga Police Department's gang validation form that identified the Defendant as a member of the Athens Park Blood gang. First, the Defendant argues that the form was not admissible under Rule of Evidence 404(b) because it did not establish clear and convincing proof of his gang affiliation and because the danger of unfair prejudice outweighed any potential probative value. Second, the Defendant contends that the gang validation form was inadmissible hearsay. We shall address each issue in turn.

### *A. Rule 404(b)*

This Court has held that evidence of gang affiliation is character evidence subject to Tennessee Rule of Evidence 404(b). *See, e.g.*, *State v. Shasta Jackson*, No. E2014-01387-CCA-R3-CD, 2015 WL 6756318, at *9 (Tenn. Crim. App. Nov. 5, 2015), *perm. app. denied* (Tenn. May 5, 2016); *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App. June 27, 2001), *no perm. app. filed*. Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts" is inadmissible if offered to show a defendant's "action in conformity with [a] character trait" but may "be admissible for other purposes." *See also State v. Parton*, 694 S.W.2d 299, 654 (Tenn. 1997). "The general rule excluding such evidence is based on the recognition that the evidence may lead a jury to convict a defendant for an apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." *Orlando Crayton*, 2001 WL 720612, at *3 (citing *State v. Bordis*, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995); *State v. Tizzard*, 897 S.W.2d 732, 743-44 (Tenn. Crim. App. 1994)).

Such evidence may be admissible for other non-propensity purposes, such as to establish the defendant's identity, motive, or intent; to rebut a defense of mistake or accident; to show a common scheme or plan; or to provide necessary contextual background or a completion of the story. *See* Tenn. R. Evid. 404(b), Advisory Comm. Cmts.; *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. Gilliland*, 22 S.W.3d 266, 272 (Tenn. 2000). In order to admit other act evidence for one or more of these purposes, the following requirements must be met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Rule 404(b) has been described as a rule of exclusion rather than inclusion, and "[t]rial courts have been encouraged to take a 'restrictive approach of [Rule] 404(b) . . . because "other act" evidence carries a significant potential for unfairly influencing a jury.'" *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014) (quoting *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)). However, when the trial court has substantially complied with the requirements of the Rule, as in this case, we will review the trial court's decision to admit or exclude the other act evidence under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). As stated above, "[a] court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." *Jones*, 450 S.W.3d at 892 (internal quotation and citation omitted).

In this case, the Defendant filed a motion in limine seeking to exclude any reference to his alleged gang affiliation. The State then filed a notice of intent to admit such evidence under Rule 404(b) for the non-propensity purposes of establishing identity, motive, and intent. Specifically, the State alleged that the Defendant, a member of the Athens Park Bloods, had the motive and intent to shoot Mr. Christopher, a member of the Bounty Hunter Bloods, because of the on-going feud between the two gangs.

The trial court held a hearing on March 27 and 30, 2017, at which Investigator Winbush testified as an expert in gang investigations and gang member validation. Investigator Winbush testified that he was a gang investigator for the Chattanooga Police Department in January of 2015 and that he was responsible for maintaining the database of gang validation forms. Investigator Winbush testified that the forms are based on a national standard for identifying gang members used by the Tennessee Department of Correction and the police departments for other major cities. The form, which is completed and updated based on law enforcement interactions with suspected gang members, assigns points for different indicators of gang association, such as wearing gang colors, having gang tattoos, associating with known gang members, self-admitting gang membership, or being named as a gang member by others. Investigator Winbush

testified that a person is validated as a gang member if they have ten points or more, while a person with less than ten points is considered an associate of the gang.

The Defendant's validation form, which was completed in October of 2014, indicated that he had thirteen points based on photographs of the Defendant wearing gang colors, making gang signs with his hands, and associating with other known gang members, as well as being named as a gang member in correspondence. In addition to the gang validation form, the State entered into evidence multiple photographs from the Defendant's Facebook account showing the Defendant wearing red and black, flashing gang signs with his hands, and hanging out with other known gang members, including the son of the founder of the Athens Park Bloods in Chattanooga. Additionally, the State introduced into evidence the recorded jail phone call between the Defendant and Mr. Birdsong, in which both used slang that Investigator Winbush testified was associated with the Blood gang. Based on all of this evidence and Investigator Winbush's expert opinion, the trial court found that there was clear and convincing evidence that the Defendant was a member of the Athens Park Blood gang. The trial court found that the Defendant's gang membership was probative of his identity, motive, and intent based on the State's theory that this shooting was part of an on-going feud between rival gangs and that the potential prejudice did not outweigh the probative value.

On appeal, the Defendant argues only that the admission of the gang validation form itself violated Rule 404(b). Specifically, the Defendant argues that the validation form does not establish clear and convincing evidence of gang membership because the point system used to validate someone as a gang member is "arbitrary and capricious." Additionally, the Defendant argues that the form is unduly prejudicial because of the potential implication that someone with more than ten points "is more entrenched with a gang or [holds] a higher rank[.]" The Defendant concedes that Investigator Winbush could testify as to his expert opinion that the Defendant was a member of the Athens Park Blood gang, but the Defendant asserts that this testimony rendered the validation form "unnecessary." The State responds that the Defendant's argument "misses the mark" because the validation form was not the only piece of evidence considered by the trial court in determining whether the Defendant's gang affiliation had been clearly and convincingly established. The State also argues that the validation form was not more prejudicial than probative because it did not contain prejudicial information regarding other bad acts of the Defendant.

The Defendant does not challenge the trial court's finding that evidence of his gang affiliation was probative of the non-propensity issues of identity, motive, and intent. *See* Tenn. R. Evid. 404(b)(2). This Court has repeatedly held that evidence of gang affiliation may be admissible for such purposes. *See, e.g., State v. Ronald Eugene Brewer, Jr.*, No. E2010-01147-CCA-R3-CD, 2011 WL 2732566, at *17 (Tenn. Crim. App. July 14, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011); *State v. Justin Mathis*,

No. W2005-02903-CCA-R3-CD, 2007 WL 2120190, at *9 (Tenn. Crim. App. July 20, 2007), *perm. app. denied* (Tenn. Dec. 26, 2007); *State v. Demond Gardner*, No. W2002-00607-CCA-R3-CD, 2003 WL 21488004, at *9 (Tenn. Crim. App. June 26, 2003), *perm. app. denied* (Tenn. Dec. 1, 2003).

With regard to the Defendant's assertion that the gang validation form alone does not establish clear and convincing evidence of his gang affiliation, we note that Rule 404(b)(3) speaks of the "proof of the other crime, wrong, or act." The proof of the Defendant's affiliation with the Athens Park Bloods consisted not only of the validation form but also the photographs from the Defendant's social media, the recorded phone call with the leader of the rival gang, and Investigator Winbush's expert opinion about the Defendant's use of certain hand gestures and slang words. The trial court thoroughly considered all of this proof in determining that the Defendant's gang affiliation was established by clear and convincing evidence. The Defendant has not established that the trial court's assessment of this evidence was clearly erroneous.

Furthermore, the trial court found that the probative value of the gang-affiliation evidence was not outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 404(b)(4). Only the first page of the validation form, which lists the Defendant's demographic information, his gang affiliation, and the number of points assigned in each category of "gang identifiers," was admitted at trial. The second page of the validation form, which explains why points were assigned in each category and includes comments that the Defendant "has been implicated in a multitude of shootings" and "has been a constant concern for law enforcement," was only admitted during the pretrial hearing; this prejudicial information was not presented to the jury. The Defendant speculates that the jury could draw prejudicial inferences from the number of points on the Defendant's validation form; however, this is not supported by the testimony of Investigator Winbush. Investigator Winbush testified that at least ten points were required to validate someone as a gang member, but he did not testify that the points were used to establish someone's rank within a gang or that a person with more than ten points was more "entrenched" in the gang. Significantly, the section on the Defendant's form for "Gang Rank" is blank. The trial court did not abuse its discretion in determining that the gang validation form, along with the other evidence of the Defendant's gang affiliation, was admissible under Rule 404(b).

### B. Hearsay

The Defendant also argues on appeal that the gang validation form was inadmissible hearsay because, like a police report, it contains "opinions and conclusions of law enforcement officers in determining whether a person is a gang member or associate." *Cf. State v. Marchello Karlando Gossett*, No. W2015-02414-CCA-R3-CD, 2017 WL 1163683, at *24 (Tenn. Crim. App. Mar. 28, 2017) (citing *McBee v. Williams*,

405 S.W.2d 668, 671 (Tenn. Ct. App. 1966) for the proposition that police reports are inadmissible hearsay), *perm. app. denied* (Tenn. Aug. 18, 2017). The State notes that the record is not clear if the Defendant made this objection in the trial court. When the gang validation form was introduced at trial, the Defendant's counsel stated that he was "reserv[ing] those same objections" that were made "during the hearing before the admission of these things." There was no discussion during the March 2017 hearing as to whether the gang validation form constituted hearsay or would be admissible at trial. In his brief, the Defendant refers to a comment made by the State during a motion hearing in January 2017; however, as noted above in the discussion of Ms. Horton's identification, the transcript of this hearing is not in the record on appeal. There is nothing in the record before this Court showing that the Defendant raised a hearsay objection to the validation form. Thus, this issue has been waived. *See* Tenn. R. App. P. 36(a); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000) ("This court is extremely hesitant to put a trial court in error where its alleged shortcoming has not been the subject of a contemporaneous objection.").

## IV. Jail Phone Call

The Defendant argues that the trial court erred in admitting the recorded jail phone call between the Defendant and Mr. Birdsong because it contained inadmissible hearsay. While the Defendant concedes that his own statements in the call are admissible as admissions by a party-opponent, *see* Tenn. R. Evid. 803(1.2), he argues that Mr. Birdsong's statements were admitted for the truth of the matter asserted, namely the Defendant's gang affiliation and the existence of a gang feud, and did not qualify under any exception to the hearsay rule. The State responds that Mr. Birdsong's statements were not admitted for the truth of the matter asserted but to give context for the Defendant's statements; thus, they were not hearsay. *See State v. Damarkus Lowe*, No. E2017-00435-CCA-R3-CD, 2018 WL 3323757, at *18 (Tenn. Crim. App. July 6, 2018), *perm. app. denied* (Tenn. Nov. 15, 2018).

Hearsay is "a statement other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible unless an exception applies. Tenn. R. Evid. 802. Although a trial court's factual findings in ruling on a hearsay objection are binding on this Court unless the evidence preponderates against them, the question of whether a statement is hearsay or whether it qualifies for an exception to the hearsay rule are questions of law, which this Court reviews de novo. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).

As an initial matter, we reject the State's argument on appeal that the statements of Mr. Birdsong were not admitted for the truth of the matter asserted. Both the recorded phone call and a transcript thereof were admitted into evidence, and the recording was

played in its entirety while the jury was allowed to follow along with copies of the transcript. We note that the parties did not request and the trial court did not give a limiting instruction that the jury could not consider Mr. Birdsong's statements for the truth of the matter asserted. The prosecutor then specifically asked Investigator Winbush to explain several statements contained within the recording:

[Prosecutor]: On page 2 of the transcript . . . . Line 23 to 24, Mr. Birdsong says, "That's why we can't find that [racial slur abbreviation] ass, bro. We can't find that [racial slur abbreviation] for [expletive]." Who's he referring to?

[Inv. Winbush]: Based on the context of the call, it appears that Mr. Birdsong is referring to the victim in this case, the victim-witness, Marcell Christopher.

[Prosecutor]: Point your attention to page 5, lines 17 and 18 and 19. Here they're referring to a Bobby, and they say, "That [racial slur abbreviation] -- he just -- just [expletive] up because that little kid got killed. You know what I'm saying?" . . . . What's your opinion about who they're talking about there at lines 17, 18 and 19?

[Inv. Winbush]: Well, leading up to this in the call, Mr. Sims refers to running into Bobby, and Mr. Birdsong confirms that they're talking about the same Bobby because he referenced what happened to Mr. Bobby Johnson's face when he was arrested. Mr. Sims said he ran into him in the jail, and he's saying he wasn't on his side, and Mr. Birdsong said the reason why he wasn't, he was still mad about it, is because that the kid got killed, and the kid that he's referring to is his stepson . . . .

[Prosecutor]: . . . . To page 6, lines 16 and 17, Mr. Birdsong says, "I feel like I don't want to keep [expletive] like that going and all of us is damu." What does that mean?

[Inv. Winbush]: He's saying that everyone that's beefing on both sides, Bounty Hunter and Athens Park, they're all damu. "Damu" is a term they use, a reference that Bloods and also rival gang members refer to Blood gang members as "damu," that being because "damu" is the Swahili word for blood.

[Prosecutor]: On page 9 of the transcript, at the top, lines 1, 2 and 3, coming over from the last page, Mr. Birdsong says, "You know, like

I told them, [racial slur abbreviation], we ain't fixing to shoot no Athens Park [racial slur abbreviation]." . . . . Why would Mr. Birdsong say that?

[Inv. Winbush]: Well, he's, he's referencing that -- and confirmed that there was a beef, a feud going on between his group, Bounty Hunters, and the Athens Park Blood members, and he was, based on the context, saying that because it started when he was in jail, and he didn't agree with Blood on Blood or damu on damu, as he refers to; because he didn't agree with it, he wasn't going to tell them and allow them to shoot any, anyone that was Athens Park Blood.

[Prosecutor]: Anybody under him?

[Inv. Winbush]: That's correct, if he can influence it.

[Prosecutor]: Page 11 of the transcript, starting at line 5, Mr. Birdsong says, "I can respect that. I respect that. Me being the big homie," and the transcript reads "what." What is the -- is that confirming that Mr. Birdsong is the big homie of Watts?

[Inv. Winbush]: That's correct. He's saying that he is the big homie. "Big homie" refers to top dog or leader in charge, and he says that him being the leader or big homie of Watts. So he's, he's acknowledging and making it known that he is the top dog in charge of the Bounty Hunter Bloods in Chattanooga.

[Prosecutor]: And is that Watts the same Watts that Baby Watts, Marcell Christopher, is associated with?

[Inv. Winbush]: That's correct, it is the same. Throughout the call, he makes reference to 111, such as 111 percent, basically acknowledging that he claims the same as Ace Line, 111 Bounty Hunter Bloods.

[Prosecutor]: . . . . To page 12, line 17, Mr. Birdsong says "Paperwork -- that's one thing about paperwork, little homie, paperwork don't lie at all." Line 21, Mr. Sims says, "I'm saying have you seen it, though?" Line 23, Mr. Birdsong says, "What? Talking about that paperwork with dude, little homie?" Mr. Sims says, "Yeah." What are they referring to there?

- 17 -

[Inv. Winbush]:   "Paperwork" is known amongst the criminal world, amongst law enforcement, gang members, as being the affidavit of complaint or any kind of police documentation that someone's mentioned in, whether that be the accused or the accuser, and it is common practice for anyone who's mentioned, or if there's an allegation of someone being a witness or a victim of a crime, for the gang to summon paperwork just to verify or confirm if they're actually what they call snitching, because it's frowned upon in the gang.

[Prosecutor]:   What person that Mr. Birdsong would have any authority over would be in Mr. Sims's paperwork?

[Inv. Winbush]:  That would be Marcell, Marcell Christopher.  Baby Watts, him being a little homie or a junior member of the gang, Mr. Cornelius Birdsong wouldn't be directly in charge of him, but he, being the top dog in charge, would be able to have an influence on him, Mr. Marcell Christopher, for being in someone's paperwork.

[Prosecutor]:  Page 13, in response to that, Mr. Birdsong says, "Yeah, that's the first thing they showed me," in reference to the paperwork. "Here's what I told them, though. I said, 'Hey, Blood man, find that [racial slur abbreviation] real quick, Blood, and strip him.'"  What does that mean?

[Inv. Winbush]:  Well, he's saying that the first thing that he saw after the accusation was the paperwork, because like I said, it's, I mean, it's just the number one rule, it's always summoned after something of this such, and he's saying that when he saw it, he disagreed with it because of Mr. Marcell Christopher stating that Mr. Sims was the person that shot him.  He told them -- "them" being the gang and the people that's directly in charge of Mr. Sims [sic] -- to find him and strip him, basically strip him of his colors, of his flag, because it was not in accordance with what the gang is supposed to do, which means not snitching, keeping it in the streets.

[Prosecutor]:  Page 13, line 7, same page as before, "I don't even want that [racial slur abbreviation] in Chattanooga no more.  I don't care nothing about his mom or his dad or none of that shit.  You know what I'm saying."  Farther down, lines 16, 17, "So that right there is going to be a domino effect and I feel like that [racial slur abbreviation] don't need to be out there.  He needs to be gone for

real. You know what I'm saying." Who is Mr. Birdsong referring to there?

[Inv. Winbush]: He's referring to Mr. Marcell Christopher.

[Prosecutor]: Line 19 is Mr. Sims's response, he says, "Yeah"; is that correct?

[Inv. Winbush]: That's correct.

[Prosecutor]: Page 16, line 17, Mr. Birdsong, "My thing is to get him and at least -- and if the homies don't want to do nothing to him, at least get to him and try to convince this [racial slur abbreviation], hey, bro, don't do that, bro. If anything, go in there and say, man, it wasn't him, that you wasn't in your right mind, you blamed the wrong dude, it wasn't him, it was three folk dudes." What does that mean, Investigator Winbush?

[Inv. Winbush]: He's basically saying that his strategy is to find Mr. Marcell Christopher and intimidate and influence him to come into court and lie and basically say that it wasn't Cortez Sims, that he wasn't in his right mind, and blame someone else, and that, that if, and only if, the other members of the gang didn't want to actually harm him would that be the strategy.

[Prosecutor]: Page 17, lines 2 really through 8, Mr. Birdsong says, "That's what I'm trying to get him for, but I believe since he know we hunting" him -- it says, "we hunting," and then it says "unintelligible" there. What does "hunting him" mean?

[Inv. Winbush]: "Hunting" means that they're actively looking for him, on the prowl, by any means necessary. They're knocking on doors, they're making it known. Their -- the streets have basically given him some type of intel that the Bounty Hunter Bloods are looking for him because they're not pleased with him snitching, and because they know -- he -- Marcell Christopher knows that the Bounty Hunters are looking for him, that he's hiding, he's not making himself present within the city.

[Prosecutor]: Page 18, line 2, Mr. Birdsong, "I give you -- I give you -- I give you my word as a man, bro, I'm going to try -- I'm trying my

best to get ahold of him so I can stop it.  You hear what I'm saying."
Who is he referring to?

[Inv. Winbush]:  Again, he's referring to Marcell Christopher.

[Prosecutor]:  Now, on page 21, Mr. Birdsong says, "I'm 111 percent official, bro.  You need to understand that.  I got you and I'm going to try my best.  I'm giving you my word as a man, bro, I'm going to try my best to stop that."  What does "111 percent" mean?

[Inv. Winbush]:  You'll hear people say, "I'm a hundred percent real or authentic," meaning that he's not telling any lies, he's a man of his word.  When he puts an emphasize on "111 percent," it goes back to what I said about the most commonly known and largest faction or set of the Bounty Hunter Bloods, being 111th Bounty Hunter Bloods, Ace Line Bloods, so he's saying that "me being 111 percent," he's saying that "I'm a hundred percent Bounty Hunter Blood," and that because he's putting it on his gang, on his affiliation with the Bounty Hunters, that "you should believe me that I'm going to do everything in my word to stop your accuser, Marcell Christopher, from coming to court.

As can be seen, with the exception of the Defendant's reference to "Bobby" and question about "paperwork," the prosecutor's questions focused solely on statements made by Mr. Birdsong.  We note that there were other statements by the Defendant during the phone call that were not specifically highlighted by the prosecutor's questions, such as his agreement with Mr. Birdsong that the feud should be settled and his insistence that he did not commit this offense.  However, this extensive discussion of Mr. Birdsong's statements and their meaning belies the State's assertion on appeal, relying on this Court's opinion in *Damarkus Lowe*, that Mr. Birdsong's statements were not admitted for the truth of the matter asserted but only to provide context for the Defendant's statements.  Unlike *Damarkus Lowe*, in which "[t]he State did not ask the jury to believe what those individuals said on the recording," 2018 WL 3323757, at *18, the State in this case clearly relied on Mr. Birdsong's statements to establish both that the Defendant was a gang member and that there had been a feud between the two gangs.  Because Mr. Birdsong's statements on the recorded phone call were offered for the truth of the matter asserted, they constitute hearsay under Rule 801(c).

However, like with the gang validation form discussed above, the Defendant has waived this issue by failing to clearly raise a hearsay objection.  When the recorded phone call and transcript were admitted into evidence, the trial court noted that the Defendant's "objection is continuing."  However, although the recorded phone call was

admitted and discussed in great detail during the March 2017 hearing, it was in the context of determining whether evidence of the Defendant's gang affiliation would be admissible under Rule 404(b) and whether evidence of the gang feud would be admissible under Rule 403. The Defendant did not raise a hearsay objection to the recorded phone call during that hearing. If a hearsay objection was raised during the January 2017 hearing, as stated above, that transcript is not in the record. When a defendant fails to object on the basis of inadmissible hearsay, "the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" *State v. Smith*, 24 S.W.3d 274, 280 (Tenn. 2000) (quoting *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981)). Therefore, the Defendant's claim that the phone call should have been excluded as inadmissible hearsay is waived. *See* Tenn. R. App. P. 36(a).

## V. Admission of Evidence Seized from Talladega Avenue

The Defendant argues that the trial court erred by admitting into evidence a nine-millimeter handgun and shell casings collected by law enforcement from Mr. Toney's residence on Talladega Avenue when ballistic testing had determined that the projectiles and shell casings collected from the crime scene were not fired by that gun. The Defendant argues that this evidence was irrelevant and potentially confusing or misleading to the jury. The State responds that the evidence was relevant because it "illustrated the investigative process undertaken by law enforcement in this case" and excluded Mr. Toney as a suspect.

As stated above, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence that is not relevant is not admissible. Tenn. R. Evid. 402. Additionally, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Tenn. R. Evid. 403. This Court reviews a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *Davidson*, 509 S.W.3d at 207.

During Officer Brooks' testimony, the State entered into evidence photographs of a nine-millimeter handgun and nine-millimeter shell casings found at the home of Mr. Toney, the Defendant's ex-stepbrother. When the State asked Officer Brooks to describe the photograph of the firearm, the Defendant objected that this evidence was irrelevant. The State argued that the evidence was relevant because it was collected during the investigation and was included on the TBI lab report. The trial court ruled as follows:

I find it's relevant as being part of the investigation . . . . You know, I think that in context, oftentimes law enforcement is faulted for what they didn't look at or examine. Where they have looked at it and examined it, then it becomes part of the investigation. Your cross examination can help the jury establish that there is no real weight that it carries against [the Defendant].

The Defendant's counsel argued that the evidence "has no bearing at all on this case," and the trial court agreed that "it has no bearing on [the Defendant's] alleged acts if it can't be tied to him, but it is part of the investigation." The State then asserted that the evidence established that Mr. Toney was "a non-viable alternative suspect." The trial court suggested that the Defendant's objection was late because the photographs of the gun and shell casings had already been admitted into evidence and shown to the jury, and the trial court did not want the jury to speculate as to the significance of the gun. The trial court suggested that "maybe pretrial, if I had had an opportunity to view this, I might have determined that it could be excluded from the report, but that's not been done pretrial." The trial court asked if "there [is] something prejudicial against [the Defendant] related to this gun," and the Defendant's counsel responded, "Not that I know, other than the fact that this gun is with a family member of his[.]" The trial court stated that it was not going to require the State to redact the TBI lab report and ruled that evidence of the gun and shell casings recovered from Talladega Avenue were admissible.

Because the Defendant objected at trial only on the basis that the evidence should have been excluded as irrelevant under Rule 402, his argument on appeal that the evidence should have been excluded as confusing or misleading under Rule 403 is waived. *See State v. Schiefelbein*, 230 S.W.3d 88, 129 (Tenn. Crim. App. 2007) (holding that "a party is bound by the ground asserted when the party objected at trial"); *State v. Matthews*, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990). We agree with the Defendant that the evidence of a gun being recovered from the home of his ex-stepbrother, which the TBI conclusively determined was not the gun used in the shooting in this case, was not relevant. While it is clear why the police would have collected and tested a nine-millimeter gun found in the possession of a family member of the Defendant during the course of their investigation, the mere fact that they did so did not make any fact that was of consequence *at trial* more or less probable. Specifically, the fact that the police found this gun did not make it any more or less likely that the Defendant committed these offenses. The State's argument that the evidence was relevant because it excluded Mr. Toney as a suspect is unavailing because neither the Defendant nor any other person ever suggested that Mr. Toney could have been an alternate suspect. The trial court's concern about police being faulted for an insufficient investigation is similarly misplaced since the Defendant never challenged that aspect of the investigation. Because this gun was not related to the offenses in this case, it was irrelevant. *See State v. Justin Mathis*, No. W2005-02903-CCA-R3-CD, 2007 WL 2120190, at *10 (Tenn. Crim. App. July 20,

2007) (holding that photograph of gun on defendant's brother's phone was irrelevant where the State did not offer any evidence that it was related to victim's murder), *perm. app. denied* (Tenn. Dec. 26, 2007).

However, the admission of this evidence was harmless. Both the State and the Defendant's counsel questioned Investigator Blackwell about the fact that this gun was determined not to have any association with this case and was returned to Mr. Toney. Additionally, the TBI agent who conducted the ballistic testing in this case confirmed that "those bullets and cartridge cases from the crime scene had not been fired in that pistol." This finding was reflected on the lab report that was admitted into evidence and was repeated on cross-examination. The Defendant's suggestion on appeal that the jury could have been misled into thinking that there was some connection between this gun and the evidence found at the crime scene is not supported by the record. The Defendant has not established that "the admission of this evidence more probably than not affected the verdict or resulted in prejudice to the judicial process." *State v. Rodriquez*, 254 S.W.3d 361, 374 (Tenn. 2008); *see* Tenn. R. App. P. 36(b). Therefore, the Defendant is not entitled to relief on this issue.

## VI.  Admission of Z.H.'s Bloody Onesie

The Defendant argues that the trial court erred in admitting into evidence a blood-stained onesie alleged to have been worn by Z.H. at the time she was shot, which was collected by Officer Salyers from the hospital room in which Z.H. had been treated prior to being taken to surgery. On appeal, the Defendant argues that the onesie was unduly prejudicial under Rule 403 and that the State failed to establish a proper chain of custody for the onesie. However, because the Defendant only objected with regard to the chain of custody issue at trial, his argument with regard to Rule 403 is waived. *See Schiefelbein*, 230 S.W.3d at 129.

Prior to admission, evidence must be authenticated "by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). For a piece of tangible evidence, "a witness must be able to identify the evidence or establish an unbroken chain of custody" in order to ensure "that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (internal citations omitted). However, "this rule does not require that the identity of tangible evidence be proven beyond all possibility of doubt[,]" and "[a]n item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item." *Id*. "Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id*.; *see also State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000) (holding that "the circumstances established must reasonably

assure the identity of the evidence and its integrity"). Challenges to the chain of custody of a piece of evidence are reviewed under the abuse of discretion standard. *Cannon*, 254 S.W.3d at 295.

Officer Salyers testified that he responded to Erlanger Hospital to collect evidence from the victims. Z.H. was already in surgery when Officer Salyers arrived. Officer Salyers testified that when he specifically requested evidence related to Z.H., he was directed to "the room that they had been working on her before taking her into surgery," where he collected a white onesie, a towel, and a pair of socks. The onesie was blood-stained, had a hole in the back of it, and appeared to have been cut off of Z.H. The trial court, in ruling on the Defendant's objection, noted that the video from Officer Avery's body camera showed that Z.H. was wearing a white onesie when she was taken from the scene to the hospital. The court also noted that the blood and the bullet hole were consistent with evidence that Z.H. had been shot. The trial court concluded that it was "sufficiently satisfied" that the evidence was what the State was purporting it to be.

The Defendant argues that this case is analogous to *Cannon*, in which the Tennessee Supreme Court determined that the chain of custody for a pair of pantyhose had not been properly established. 254 S.W.3d at 296-98. In that case, the only proof linking the defendant to the rape of the elderly victim was a DNA profile obtained from semen found on a pair of pantyhose. The victim did not testify and identify the pantyhose as hers. The victim's clothing had already been removed at the hospital before the State's witnesses arrived to interview and examine her. The forensic nurse examiner testified that the pantyhose were with the rest of the victim's clothes and that no one else had been in the room. However, there were no pantyhose in the photograph of the victim's belongings, and they were not mentioned in either the examiner's or the detective's reports. The supreme court concluded that "the pantyhose were not sufficiently identified as belonging to the victim by a witness with knowledge"; thus, the pantyhose and the DNA results obtained therefrom were not admissible. *Id*. at 298.

This case is distinguishable from *Cannon* because the facts and circumstances in this case reasonably establish the identity of the bloody onesie admitted at trial as the one worn by Z.H. at the time she was shot. The video from Officer Avery's body camera shows Z.H. wearing a white onesie as she is being carried down the steps of the College Hill Courts apartment. Other evidence clearly established that Z.H. had been shot in the back. When Officer Salyers went to the hospital, he requested evidence related to the victims in this case and was directed to Z.H.'s hospital room. Although, like in *Cannon*, Z.H.'s clothes had already been removed prior to Officer Salyers arrival, unlike *Cannon*, there was no contradictory or suspicious testimony about whether this particular clothing item was among the victim's belongings. The only evidence of any kind of "tampering" was Officer Salyers' testimony that the onesie appeared to have been cut off of Z.H., but this does not reasonably call into question the identity or integrity of the onesie as the one

that was worn by Z.H. at the time she was shot. Because the identity and integrity of the evidence was reasonably established, the trial court did not abuse its discretion in admitting the onesie. However, even if the trial court erred, such error was harmless because, unlike the pantyhose in *Cannon*, there was no forensic evidence linking the Defendant to this crime taken from the onesie, such as hair or DNA, that would be susceptible to tampering or cross-contamination. Therefore, the Defendant is not entitled to relief on this issue.

## VII. Admission of Evidence of an On-going Gang Feud

The Defendant argues that the trial court erred in admitting evidence of the gang feud between the Athens Park Bloods and the Bounty Hunter Bloods. The Defendant contends that Investigator Winbush's testimony did not clearly establish the existence of a feud, that the prior incidents not involving the Defendant were not relevant, and that the evidence should have been excluded as unduly prejudicial under either Rule 403 or 404(b). The State responds that the evidence was probative of the Defendant's motive and that the potential for prejudice was low because there was no evidence of prior wrongdoing by the Defendant.

As discussed above, evidence must be relevant to be admissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403. While evidence of a defendant's gang activity is analyzed under Rule 404(b) as evidence that may reflect upon the defendant's character and propensity to commit an offense, Rule 404(b) is not applicable to evidence of crimes or other bad acts committed by a person other than the defendant. *See State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002) (quoting *DuBose*, 953 S.W.2d at 653). This Court reviews a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *Davidson*, 509 S.W.3d at 207.

At the same pretrial hearing in March 2017 during which the trial court considered the admissibility of the Defendant's gang affiliation under Rule 404(b), the trial court also considered the admissibility of Investigator Winbush's testimony regarding the on-going gang feud under Rule 403. Investigator Winbush testified at the hearing, and later at trial, that the Chattanooga Police Department became aware of a feud between the Athens Park Bloods and the Bounty Hunter Bloods that began after a fight at a nightclub called Terry's Lounge in late December 2013. According to Investigator Winbush, Martrell "Tricky Trell" Arnold, one of the leaders of the Athens Park Bloods, got into an argument with Bobby Johnson, one of the leaders of the Bounty Hunter Bloods. Floyd Davis, an Athens Park Blood, was arrested that night for possession of a firearm. The police began monitoring the situation on social media.

The next specific incident occurred on January 20, 2014, when the police responded to a shooting at the home of the aunt and uncle of Quadarius "Oodie Blood" Bowling, a member of the Athens Park Bloods. Several of the witnesses on the scene, who later refused to cooperate with the investigation, initially indicated that Anthony "A.J." Malone, a Bounty Hunter Blood, was responsible. That same night, Deontray Southers, the fourteen-year-old stepson of Bobby Johnson, was shot and killed in his home. The police received information that several members of the Athens Park Bloods were responsible but were unable to make any arrests due to a lack of cooperation from witnesses. The following day, January 21, 2014, police responded to a call about shots fired at the home of LaCharleston "L.A." Haggard, an Athens Park Blood. Mr. Haggard's wife reported seeing two individuals believed to be members of the Bounty Hunter Bloods running through the back yard with a rifle.

On February 1, 2014, Charles "Man Man Park" Jones, an Athens Park Blood, was shot and killed. Witnesses indicated that the Bounty Hunter Bloods were actually targeting Deaunte "Ta Ta Blood" Dean, another member of the Athens Park Bloods. Several members of the Bounty Hunter Bloods were seen in the area prior to the shooting and were seen fleeing the area immediately after. On February 4, 2014, Quadarius Bowling was shot in the shoulder during a drive-by shooting, which was also believed to be connected to the feud with the Bounty Hunter Bloods. Then, on February 24, 2014, the Defendant's mother was injured when shots were fired at her house. The Defendant was on the scene when police arrived. The police had information that members of the Bounty Hunter Bloods were responsible. The shell casings recovered at the scene were later determined to match a firearm recovered in the possession of Mr. Birdsong during a traffic stop.

The next incident discussed by Investigator Winbush occurred on October 1, 2014, when Lakita Bowling, the mother of Quadarius Bowling, was shot and injured while he was a passenger in her vehicle. Investigator Winbush testified that the Defendant was Facebook friends with Mr. Bowling, who used the name "Parkbxi Asap" on his Facebook page. Then, on October 27, 2014, police discovered that Terrence "T.B. Blood" Bivens, an Athens Park Bloods and the brother of Floyd Davis, had been shot and killed by Ladaquis Southers, a Bounty Hunter Blood and uncle of Deontray Southers. Investigator Winbush testified that Mr. Bivens and Mr. Southers were actually close friends despite their rival gang affiliations. However, during a dispute, Mr. Southers pulled out a gun and shot Mr. Bivens. The Defendant posted a picture of Mr. Bivens on his Facebook page that same day.

On January 1, 2015, Deaunte Dean was shot and killed through the front door of his home. Investigator Winbush testified that the way Mr. Dean was killed was similar to the way Deontray Southers was killed, in that someone may have knocked on the door and then fired when the person came to answer it. Investigator Winbush testified that the

Defendant was Facebook friends with Mr. Dean, who used the name "TA TA Blood" on his Facebook page. The shooting incident in this case occurred six days after the murder of Mr. Dean. To accompany Investigator Winbush's testimony, the State also introduced into evidence a PowerPoint presentation with the names and dates of each of the above-described incidents accompanied by photographs of the victims and, where applicable, potential suspects.

Although the analysis was intertwined, the trial court carefully applied Rule 404(b) to the evidence of the Defendant's gang affiliation and Rule 403 to the evidence of bad acts committed by persons other than the Defendant, which the State asserted established the existence of an on-going gang feud. The trial court found that the "common thread" among these incidents was "the fact that all of these victims and perpetrators are members of the Athens Park Bloods or the Bounty Hunter Bloods and the fact that all of these people are apparently, by this totality of the circumstances and circumstantial evidence, involved in something that's causing them each to be victimized." The trial court found that the Defendant's "membership in one of those sets could have caused him to have the same actions as others within those sets, and the victim of the case in which he is accused is a Bounty Hunter Blood." Thus, the trial court concluded that this evidence was relevant "with regard to whether or not [the Defendant] may have had the intent, the motive, to act himself, particularly where his mother's house was shot and there was a gun that was recovered and it was recovered from Mr. Birdsong, who's the leader of the Bounty Hunter Bloods." The trial court determined that the danger of unfair prejudice associated with these "incidents of violence" and the "negative connotation toward gang members" did not substantially outweigh the probative value of this evidence under Rule 403.

This case appears to be one of first impression in Tennessee: whether a series of crimes committed by and against persons other than the Defendant can be used to establish the existence of a gang feud, which in turn is used to establish the Defendant's motive and intent to target Marcell Christopher and kill Talitha Bowman in the process. Other courts have recognized that "[r]eferences to a gang feud can supply to the jury a motive for an otherwise unexplained killing[.]" *Plummer v. United States*, 813 A.2d 182, 189 (D.C. 2002). The Illinois Court of Appeals has concluded that even where "there was no evidence presented that [the] defendant was involved in the escalating tensions between the two gangs," evidence of the defendant's gang membership and of "the simmering feud between the gangs helped explain to the jury why [the] defendant would have targeted" one of the victims and killed another in the process. *People v. Hakeem Redmond*, No. 1-15-1308, 2018 WL 6438848, at *8 (Ill. App. Ct. Dec. 6, 2018), *perm. app. denied*, 119 N.E.3d 1047 (Ill. 2019). The California Court of Appeals held that evidence of specific incidents of retaliatory gang violence preceding the victim's murder, including several that did not directly involve the defendant, were relevant to establish the defendant's motive as "retaliation as part of an ongoing rivalry between the two

gangs." *People v. Funes*, 28 Cal. Rptr. 2d 758, 766 (Ct. App. 1994). Moreover, the court concluded that those incidents in which the defendant was not involved "were less prejudicial to [the] defendant than those where [the] defendant clearly took an active role in retaliating[.]" *Id.*

We conclude that the trial court did not abuse its discretion in determining that the evidence of an on-going gang feud between the Athens Park Bloods and the Bounty Hunter Bloods was relevant under Rule 401 because it made the Defendant's alleged motive more or less probable than it would be without the evidence. As noted above, although the Defendant challenges the admissibility of the gang validation form on appeal, he does not challenge the trial court's ruling that evidence of his gang affiliation was admissible under Rule 404(b) for the non-propensity purposes of establishing motive, intent, and identity. With regard to the evidence at issue here, the Defendant argues on appeal that there was no clear and convincing evidence that the feud existed or he was involved in the feud. However, "clear and convincing evidence," the standard by which a prior crime or bad act must be established under Rule 404(b), is not the standard for determining whether evidence is relevant under Rule 401 or whether it should be excluded as unduly prejudicial under Rule 403. The Defendant has never challenged Investigator Winbush's ability to give an expert opinion regarding the existence of the feud under Rule 702 or the admissibility of the facts supporting his opinion under Rule 703. With regard to the Defendant's connection to the feud, we note that the Defendant was directly connected to the shooting at his mother's house and was indirectly connected to the Athens Park victims in several of the other incidents through his Facebook account. Because of this connection, the evidence of the gang feud was probative of the Defendant's motive to target a member of the rival gang and, thus, was relevant under Rule 401.

The question then becomes whether the danger of unfair prejudice associated with these ten acts of gang violence substantially outweighs their probative value under Rule 403. In a recent case, a panel of this Court was "troubled by the breadth of the gang evidence presented," including "extensive background information about the Gangster Disciples and the origins of various gang signs" that was "of questionable relevance." *State v. Jeremy Reynolds*, No. E2018-01732-CCA-R3-CD, 2020 WL 3412275, at *25-26 (Tenn. Crim. App. June 22, 2020). The *Jeremy Reynolds* panel noted that although evidence of the defendant's gang affiliation was relevant and admissible to show his connection to the murder weapon, which was recovered in the possession of a fellow gang member, the investigator's testimony about gangs "could have been better tailored to minimize the danger that the jury would be distracted and confused by extraneous information." *Id.*

The potential prejudice associated with the evidence in this case is not merely the fact that gangs tend to have a negative connotation and a reputation for violence. Instead,

by associating the Defendant with these specific acts of violence committed by and against third parties, there is a possibility that the jury will determine that the Defendant is guilty merely by association. *See United States v. Irvin*, 87 F.3d 860, 865 (7th Cir. 1996) ("Guilt by association is a genuine concern whenever gang evidence is admitted."). "We acknowledge that the theory of 'guilt by association' [is a] theory that has been 'thoroughly discredited.'" *State v. Roshad Romanic Siler*, No. E2005-01201-CCA-R3-CD, 2007 WL 10450, at *9 (Tenn. Crim. App. Jan. 3, 2007) (quoting *Uphaus v. Wyman*, 360 U.S. 72, 79 (1959)). Additionally, we note that this same concern with guilt by association lead in part to this Court holding that the gang enhancement statute, Tennessee Code Annotated section 40-35-121(b), was unconstitutional as it was written at that time because it "impose[d] mandatory punishment on an eligible defendant by imputing to him responsibility for the criminal activity of the gang as a collective without requiring the defendant's knowledge of and intent to promote such activity." *State v. Bonds*, 502 S.W.3d 118, 158 (Tenn. Crim. App. 2016).

In this case, we conclude that the trial court did not abuse its discretion in determining that the potential for unfair prejudice did not substantially outweigh the probative value of the evidence of the on-going gang feud. Unlike the breadth of evidence presented in *Jeremy Reynolds*, the evidence in this case was specifically tailored to those acts of violence that were directly connected to this specific feud. Investigator Winbush's testimony and the State's accompanying PowerPoint presentation were fairly straightforward and did not include any overly graphic or salacious details. While ten specific acts of violence may seem like a lot, the number of incidents presented by the State was necessary to show the retaliatory nature of the feud. Although the trial court did not give any specific limiting instruction with regard to this evidence, the trial court did instruct the jury that it could only consider the Defendant's alleged gang membership for the limited purposes of identity, motive, and intent. We note again that "Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence." *James*, 81 S.W.3d at 757. The Defendant has not established that the trial court abused its discretion in admitting this evidence of an on-going gang feud and, therefore, is not entitled to relief.

## Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE